UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

SANFORD COHEN,

        Plaintiff,

    -v-                          No.  1:23-CV-01827-LTS-SDA

DARRYL C. TOWNS, in his official capacity
as Chairman of the New York Board of
Parole, et al.,

        Defendants.

--------------------------------------------------------x

### MEMORANDUM OPINION AND ORDER

        Plaintiff Sanford Cohen ("Plaintiff") brings this action against Darryl C. Towns, in his individual and official capacity as Chairman of the New York Board of Parole, Daniel F. Martuscello, in his individual and official capacity as Commissioner of the New York Department of Corrections and Community Supervision ("DOCCS"), and Bureau Chief Yasmin Castro, Parole Officer "Doe" Greene, Parole Officer Tori Kitching, and Jane/John Does 1-5, in their individual and official capacities as employees of DOCCS (collectively, "Defendants"). (Docket entry no. 105 (the "Fourth Amended Complaint" or "4AC").)

        Pending before the Court is Plaintiff's second motion for preliminary injunction concerning Defendants' interpretation and application of the New York Sexual Assault Reform Act ("SARA"), New York Executive Law section 259-c(14), to Plaintiff. (Docket entry no. 110 (the "Motion").) The Court has jurisdiction of this action pursuant to 28 U.S.C. section 1331.

        The Court has reviewed carefully the parties' submissions and, for the following reasons, Plaintiff's Motion is denied.

<u>BACKGROUND</u>

In 2018, Plaintiff pleaded guilty to violating New York Penal Law section 263.15, "Promoting a sexual performance by a child." (4AC ¶ 77.) The plea was in "full satisfaction of 13 counts" stemming from Plaintiff's possession of "about seven or eight terabytes" of child pornography. (Docket entry no. 46-5 at 3, 7-8; docket entry no. 116 ("Defs. Mem.") at 3.) In connection with his plea, Plaintiff conceded that the child pornography was "well organized and backed up so there were multiple copies of the same library," that he "had been looking at child pornography and had an interest sexually in children for about 25 years prior to his arrest," and that "looking at these images and masturbating to these images" was "daily behavior." (Docket entry no. 46-5 at 7-8; Defs. Mem. at 3.) Plaintiff was sentenced to two years in state prison, to be followed by ten years of post-release supervision. (4AC ¶ 77.]

Because of the nature of his offense, Plaintiff was required to register as a sex offender (<u>id.</u> ¶ 78) and, following a hearing pursuant to the New York Sex Offender Registration Act ("SORA"), was initially designated a SORA Level Two offender, "without designation as a sexually violent person or predator."[1] Plaintiff left prison and began his term of post-release supervision on or about June 18, 2020. (<u>Id.</u> ¶ 79.) On February 1, 2024, following a modification evaluation and hearing, Plaintiff's SORA designation was reduced to Level One.

---

[1]     Under SORA, a sentencing court must conduct a risk determination hearing before an individual designated as a sex offender leaves custody. N.Y. CORRECT. LAW § 168-n(2)-(3). In the hearing, the court must determine whether to classify the person "as a level 3 offender (risk of repeat offense is high), a level 2 offender (risk of repeat offense is moderate), or a level 1 offender (risk of repeat offense is low)[.]" <u>Id.</u> § 168-n(3); <u>id.</u> § 168-l(6). The court must also decide whether to designate the person "a sexual predator, a sexually violent offender or a predicate sex offender, which will determine how long [they] must register as a sex offender and how much information can be provided to the public concerning [their] registration." <u>Id.</u> § 168-n(1), (3). Plaintiff's hearing took place on June 4, 2020. (4AC ¶ 78; docket entry no. 46-5.)

(Id. ¶ 84.)  Although his supervision period was initially scheduled to conclude in June 2030, Plaintiff has received "earned time credits" that will allow for early termination of his term of post-release supervision on a date no later than June 18, 2025, should his adherence to supervision conditions continue.  (Docket entry no. 113 ("Pl. Decl.") ¶ 12.)

<u>Sexual Assault Reform Act</u>

Pursuant to the Sexual Assault Reform Act, and as relevant to the instant case, individuals convicted of certain enumerated offenses (including an offense defined in Article 263 of the New York Penal Law), where the victim of such offense was under eighteen years old at the time of the offense, are subject to a mandatory condition of post-release supervision that prohibits the individual from knowingly entering into or upon any "school grounds."  N.Y. EXEC. LAW § 259-c(14).  For purposes of the statute, the term "school grounds" is defined to mean in, on, or within, <u>inter alia</u>, any building, structure, playground, or land contained within the real property boundary line of a school, or any area accessible to the public located within one thousand feet of the real property boundary line of such school.  N.Y. PENAL LAW § 220.00(14). New York courts have held that this distance "is to be measured 'by a straight-line' or 'as the crow flies' method, and not as measured along the route a pedestrian would be required to travel."  (Docket entry no. 136 ("Jt. Mem.") at 8, <u>accord</u> <u>People v. Robbins</u>, 782 N.Y.S.2d 80, 81 (N.Y. App. Div., 1st Dep't 2004) (interpreting law concerning prohibition of controlled substance sale "upon school grounds," as defined in N.Y. PENAL LAW § 220(14)), <u>aff'd</u>, 5 N.Y.3d 556 (N.Y. 2005).)

To assist in enforcing this condition, the New York Department of Corrections and Community Supervision ("DOCCS") uses a software program called the Critical Infrastructure Response Information System ("CIRIS"), which allows New York parole officers

to determine whether a proposed residence is SARA-compliant.  (Docket entry no. 117 ("Tucker Decl.") ¶ 8.)  Parole officers enter the supervisee's proposed address into the CIRIS system, and, using tax records and other publicly available information, CIRIS determines whether any school's property—as defined in the schools' tax records—is within a 1,000-foot radius of the front door of the proposed address.  (Id.; docket entry no. 137 ("Supp. Tucker Decl.") ¶¶ 5-10.)

Prior to Plaintiff's June 2020 release, the Defendants "vetted and approved [Plaintiff's] choice of housing in writing" to ensure SARA compliance.  (4AC ¶ 162.)  The housing in question was his home residence, which he had purchased in 1994.  (Id. ¶ 71.)  Following the initial approval of his home residence as SARA-compliant, Plaintiff lived in his home, with his family, for approximately seventeen months.  (Id. ¶ 163.)  Plaintiff alleges that, on November 21, 2021, "suddenly and without notice or an opportunity to be heard," he was verbally informed that his home was "transformed into a non-compliant status," meaning Plaintiff could no longer live there, despite nothing having changed in the intervening seventeen months.  (Id. ¶¶ 163-65.)  Plaintiff alleges that he was not told what school was considered to be within 1,000 feet of his residence, and that he was directed to find a new SARA-compliant address or he would be taken to a shelter by his parole officer.  (Id. ¶¶ 167-68.)  Plaintiff alleges that he was "permitted one week to find another residence[,]" that he submitted and proposed fifteen potential locations, that eleven were rejected as non-complaint, and that the remaining four locations rejected Plaintiff's lease application because of his conviction.  (Id. ¶ 169; see also Tucker Decl. ¶¶ 15-16.)

Plaintiff submitted another list of proposed addresses in November 2024.  (Docket entry no. 121 ("Pl. 2nd Decl.") ¶ 10.)  Several of these addresses were approved and their approval was communicated to Plaintiff in December 2024, but he asserts that the approved

addresses were no longer available. (Tucker Decl. ¶ 17; Pl. 2nd Decl. ¶¶ 11-12.) Another list of approvals was communicated to Plaintiff in January 2025, but, once again, Plaintiff asserts that just two locations were available, and that both were a substantial financial burden as they required 12- and 18-month leases, respectively. (Tucker Decl. ¶¶ 18-20; Pl. 2nd Decl. ¶¶ 13-15.) As a result, Plaintiff has been residing in a SARA-compliant, parole-approved shelter since December 10, 2021.[2] (Docket entry no. 117-1 ("DOCCS Chron.") at 9.) There is no dispute that SARA's geographical restriction on Plaintiff's residential opportunities, as applied by Defendants, will expire with Plaintiff's term of post-release supervision. (Jt. Mem. at 1.)

In connection with the instant motion practice, Plaintiff's counsel reports that, in response to her October 17, 2022 email, DOCCS Parole Officer Tory Kitching ("Kitching") called Plaintiff's counsel and informed her that CIRIS had been "tweaked or updated and that as a result [P]laintiff's address was deemed non-compliant." (Docket entry no. 120 ("Richman Decl.") ¶¶ 5-7).) Plaintiff states that he was given the same information. (Docket entry no. 141-5 ¶ 10.) Plaintiff maintains that there is, in fact, "no access to any school property within 1000 feet" of his residence. (4AC ¶ 172.)

Defendants assert that the initial housing approval was likely the result of an incorrect use of CIRIS by Plaintiff's then-parole officer, and that the error was discovered pursuant to a regular review of sex offender parolees' addresses and compliance with SARA on or about November 19, 2021. (Tucker Decl. ¶¶ 9-10; docket entry. 118 ("Castro Decl.") ¶¶ 5-7;

---

[2]     Although Plaintiff asserts that he was given only "one week" to find compliant housing (4AC ¶ 169), the chronology maintained by DOCCS for Plaintiff's case indicates that he was taken to a shelter on December 10, 2021, which is about 18 days after the initial non-compliant status was communicated to him, and that DOCCS was actively reviewing his alternate housing proposals in the interim for SARA compliance. (See DOCCS Chron. at 9-15.) Plaintiff does not dispute the accuracy of the December 2021 time frame.

DOCCS Chron. at 15; Supp. Tucker Decl. ¶ 12.)  At that point, Defendants assert, two parole officers verified that the address was non-compliant with SARA and promptly communicated the correction to Plaintiff on or about November 22, 2021, and Plaintiff was given approximately eighteen days to find SARA-complaint housing before he was escorted to a SARA-compliant shelter on or about December 10, 2021.  (Tucker Decl. ¶¶ 10-13; Castro Decl. ¶¶ 7-8; DOCCS Chron. at 9, 14-15.)

      Defendants have also identified the school that they assert renders Plaintiff's home non-compliant with SARA, and explained the precise methodology for the calculation performed by CIRIS in making the determination of non-compliance.  Specifically, Defendants assert that a portion of the Village Community School's ("VCS") property, as reflected in the VCS's tax records, falls within 1,000 of Plaintiff's home residence, and have proffered declarations in support of this assertion from: (1) DOCCS Senior Parole Office Amber Tucker ("Tucker"), in which Tucker explains how CIRIS operates and provides frame-by-frame CIRIS images to demonstrate that Plaintiff's home falls within a 1,000-foot radius of Village Community School (see Supp. Tucker Decl.); and (2) Leslie Johnson (docket entry no. 138 ("Johnson Decl.")), the Associate Head of School for Finance and Operations at VCS, who includes as an attachment to her declaration VCS's 1973 deed describing its boundary lines (docket entry no. 138-1 ("VCS Deed")).  The description of VCS's boundaries in the deed is consistent with Tucker's discussion of the boundary lines for VCS as defined by CIRIS.  (Compare Tucker Decl. ¶ 11 (asserting that "the corner of [VCS's] property line extends to just shy of the southeast corner of the intersection of West Tenth and Washington Streets – and according to CIRIS, such property line falls within a 1,000 foot radius of" Plaintiff's home residence), with (VCS Deed (describing the VCS's property lines as "BEGINNING at the corner

formed by the intersection of the southerly side of West 10th Street with the easterly side of

Washington Street; running there Easterly, along the southerly side of West 10th Street[,]" and,

as a western border, running "Northerly, along the easterly side of Washington Street").)

Defendants maintain that the initial determination that Plaintiff's home address

was SARA-compliant was likely user error, and that the November 2021 finding of non-

compliance was not the result of a software "tweak" or "update," proffering declarations from

(1) Kitching, who states that he has no memory of telling Plaintiff's counsel that the CIRIS

software was ever "tweaked" or "updated" (docket entry no. 139 ("Kitching Decl.") ¶¶ 5-6);

(2) Michael Martel, an individual who works in the New York State Office of Information

Technology Services' Chief Data Office—the office responsible for maintaining CIRIS—who

states that, while CIRIS periodically updates its datasets at least once per year, there has been no

update to, or recalibration of, the measurement tools of CIRIS since the current version was

released in 2016, but explains that individual end users must enter the relevant buffer zone in

CIRIS (in this case, 1,000 feet for SARA purposes) (docket entry no. 140 ("Martel Decl.")

¶¶ 6, 8-9; Jt. Mem. at 3); and (3) Leslie Johnson, who states that the property lines for VCS have

included the parcel at the southeast corner of the intersection of West Tenth and Washington

Streets for more than 50 years (Johnson Decl. ¶ 4).

Procedural History

On March 2, 2023, Plaintiff initiated the instant action, challenging the

constitutionality of several of his conditions of post-release supervision and related provisions of

state law, including SARA and the condition on his post-release supervision imposed pursuant to

SARA. (See docket entry no. 1.) Plaintiff initially moved for a preliminary injunction on March

5, 2024, seeking relief from certain conditions restricting his access to internet and social media.

(Docket entry no. 61.)  The motion was ultimately terminated prior to being resolved by the Court, after Plaintiff informed the Court that "[t]he goals of the preliminary injunction ha[d] been achieved[.]" (See docket entry nos. 78-79.)

On January 13, 2025, Plaintiff filed the operative Fourth Amended Complaint (see 4AC), and, on January 25, 2025, Plaintiff filed the instant second motion for preliminary injunction as to the SARA-related claims.  (See Motion.)  On February 25, 2025, the Court ordered supplemental briefing concerning several legal and factual disputes presented in the Motion, which briefing was submitted on March 31, 2025.  (Docket entry 124; Jt. Mem.)

DISCUSSION

Ordinarily, a party seeking a preliminary injunction must establish: "(1) 'irreparable harm'; (2) 'either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party'; and (3) 'that a preliminary injunction is in the public interest.'"  New York v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015) (citation omitted).  Where, however, the moving party seeks to enjoin "governmental action taken in the public interest pursuant to a statutory or regulatory scheme," a party "cannot rely on the 'fair-ground-for-litigation' alternative," but rather must demonstrate a likelihood of success on the merits.  Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs., 769 F.3d 105, 110 (2d Cir. 2014) (citation omitted).  Moreover, to obtain a mandatory injunction that alters the status quo, the showing of likelihood of success on the merits must be "clear" or "substantial," and the movant must make a "strong showing" of irreparable harm.[3]  Actavis PLC,

---

[3]    Plaintiff argues that the injunction he seeks is "depending on the point of view both mandatory and prohibitory[,]" because Plaintiff "had no choice but to follow Defendants' directive to live in a shelter and thus he had no power to seek a preliminary injunction to

787 F.3d at 650 (citations omitted).

<u>Likelihood of Success on the Merits</u>

Plaintiff seeks a preliminary injunction with respect to the following claims in his Fourth Amended Complaint:[4] (1) claims for violation of the Due Process Clause of the Fourteenth Amendment, based on Plaintiff's positions that, "insofar as the legislature has codified a methodology for the evaluation of where sex offenders may reside . . . that process is ignored by Defendants[,]" referencing Chapter 568 of the Laws of New York, 2008 ("Chapter 568"), and that "SARA as applied is unconstitutionally vague"; (2) claims for violation of the Fifth and Fourteenth Amendments, arguing that Defendants refused to "abide by the evaluative mandate of New York State law," <u>i.e.</u>, Chapter 568, and that any SARA-related restriction is unconstitutional as to his home "because [Plaintiff] owned his property prior to the enactment of SARA"; and (3) claims for violation of the First and Fourteenth Amendments, in that "SARA has impacted [Plaintiff's] right to Free Speech[.]" (Docket entry no. 112 ("Pl. Mem.") at 27.) The Court addresses these claims in turn.

<u>Due Process Claims</u>

Plaintiff argues that he has a "procedural and substantive due process right to the benefit of the law as set forth by the New York State Legislature," citing Chapter 568, and further argues that the SARA restriction as applied to him as a condition of post-release

---

preserve the status quo ante." (Docket entry no. 112 ("Pl. Mem.") at 26-27.) Whatever force this argument may have is severely undermined by the fact that the instant Motion was filed more than three years after Plaintiff's first notification that his home address was determined to be non-compliant with SARA, and nearly two years after the commencement of the instant litigation. (Pl. Decl. ¶ 18; Tucker Decl. ¶¶ 10-12.) At this stage, any injunction issued would clearly alter the years-long status quo.

[4]    The Court construes all such claims as asserted under 42 U.S.C. section 1983. (<u>See</u> 4AC ¶ 181.)

supervision violates his right to substantive and procedural due process under a rational basis standard of review.  (Pl. Mem. at 27-32.)  Defendants argue that SARA is not unconstitutional on its face or as applied to Plaintiff, noting that the residency limitation "has been held to be non-punitive and constitutional, designed to protect the public (and children in particular) rather than to punish," and arguing that it is appropriate as applied to Plaintiff as a result of his conviction for sex crimes involving young children.  (Defs. Mem. at 8-9.)  Defendants also contend, in essence, that Plaintiff has misinterpreted the force and effect of Chapter 568, that SARA's geographic restriction is in all cases mandatory for those that fall within the reach of the statute, and that, in any case, Plaintiff has no federal constitutional right to the enforcement of specific state-mandated procedures.  (Id. at 10-13.)

SARA As Applied to Plaintiff

Individuals on parole are entitled to "limited due process rights in the conditions of their parole[.]"  Singleton v. Doe, 210 F. Supp. 3d 359, 374 (E.D.N.Y. 2016).  A plaintiff may therefore mount a due process challenge "based on the substance of the conditions and/or the basis for imposing such conditions[,]" Singleton v. Doe, No. 14-CV-0303-MKB, 2014 WL 3110033, at *3 (E.D.N.Y. July 7, 2014), but "the imposition of conditions—whether imposed prior to or subsequent to release, by the parole board or a field parole officer—must be upheld as long as they are reasonably related to a parolee's past conduct, are not arbitrary and capricious, and are designed to deter recidivism and prevent further offenses." Robinson v. New York, No. 09-CV-0455-GLS-RFT, 2010 WL 11507493, at *3 (N.D.N.Y. Mar. 26, 2010) (citations omitted); see also Boddie v. Chung, No. 09-CV 04789-RJD-LB, 2011 WL 1697965, at *2 (E.D.N.Y. May 2, 2011) (noting that "[r]eview of conditions of parole is generally a matter for state courts").

While Plaintiff argues that, under this lenient standard of review, the SARA restriction nevertheless fails, Defendants have persuasively established that the restriction is reasonably related to Plaintiff's prior criminal conduct, is not arbitrary and capricious as applied to Plaintiff, and is designed to deter recidivism.  Plaintiff's offense involved the download of terabytes of child pornography and, in connection with this offense, Plaintiff conceded that: (1) "the victims were quite young," (2) he "had been looking at child pornography and had an interest sexually in children for about 25 years prior to his arrest," and (3) "looking at these images and masturbating to these images" was "daily behavior."  (Defs. Mem. at 3 (citing docket entry no. 45-5 at 6-8).)  Although Plaintiff argues that his offense was a non-contact offense, courts have nevertheless found a reasonable basis for residency restrictions in similar circumstances because "[e]ven if the regular presence of children is unlikely to lead Defendant to physically harm a child . . . it is logical to infer that it could cause Defendant to relapse into viewing child pornography."  See, e.g., United States v. De Los Santos, 827 F. App'x 757 (9th Cir. 2020) (reviewing district court imposition of federal supervised release condition for abuse of discretion); (see also Defs. Mem. at 18 (arguing that SARA's residency restriction serves "the State's interest in protecting the public, particularly children, from victimization by convicted sex offenders, and decreasing the danger of recidivism posed by these convicted" individuals).)

Moreover, the initial grant of approval to reside in his home—whether based on a mistake by Plaintiff's then-parole officer or due to some error existing in CIRIS that was later corrected—did not give him a liberty or property interest in continuing to reside there.  See LaTrieste Rest. & Cabaret v. Vill. of Port Chester, 40 F.3d 587, 590 (2d Cir. 1994) ("[P]rinciples of laches or estoppel do not bar a municipality from enforcing ordinances that have been allowed to lie fallow."); Holdman v Office of Ct. Admin., 967 N.Y.S.2d 867, 867 (N.Y. Ct. Cl. 2012) ("If

incorrect information dispensed by a governmental entity (or entities), at variance with a given statutory/regulatory scheme, can readily be converted into an enforceable promise, such would undermine, if not eviscerate . . . the Court of Appeals' holdings on governmental estoppel[.]" (citations omitted)), <u>cited with approval in</u>, <u>NRP Holdings LLC v. City of Buffalo</u>, No. 11-CV-472, 2017 WL 745860-WMS, at *12 (W.D.N.Y. Feb. 27, 2017), <u>aff'd</u>, 916 F.3d 177 (2d Cir. 2019).

Nor is it apparent that Defendants acted so arbitrarily as to violate Plaintiff's rights under the Due Process Clause in adjusting Plaintiff's conditions of supervision to account for the purportedly mistaken approval. Defendants assert that, pursuant to a regular review of sex offender parolees' addresses and compliance with SARA, the error in approving Plaintiff's home residence was discovered, that two independent parole officers, relying on CIRIS, confirmed that the address was non-compliant with SARA, and that the error was then communicated to Plaintiff, who was given approximately eighteen days to find SARA-complaint housing before he was escorted to a SARA-compliant shelter setting. (Tucker Decl. ¶¶ 10-13, Castro Decl. ¶¶ 7-8.) Defendants have also identified the school that renders Plaintiff's housing non-compliant—going as far as to include a deed documenting the school's boundaries—and the methodology pursuant to which such non-compliance was calculated. <u>See</u> discussion <u>supra</u> pp. 6-7. Defendants have thus persuasively established that the rejection of Plaintiff's housing as non-compliant was well-founded and consistent with the governing law, SARA.[5] <u>Cf.</u>, <u>e.g.</u>, <u>Yunus v. Robinson</u>, No. 17-CV-5839-AJN-BCM, 2018 WL 3455408 at *36 (S.D.N.Y. June 29,

---

[5]     Even if DOCCS' November 2021 determination that Plaintiff's home address was not SARA-compliant was the result of a "tweak" or "update" to the software, Defendants have persuasively demonstrated in their supplemental briefing and declarations that the address does, in fact, fall within 1,000 feet of VCS, which is a good-faith basis for adjusting Plaintiff's conditions of supervised release. (<u>See</u> Jt. Mem. at 3.)

2018) (recommending denial of motion to dismiss due process claim where parolee-plaintiff alleged that denial of proposed residence pursuant to SARA was result of parole officer's desire for convenience in "keep[ing] all of her parolees together in the shelter"), adopted by, 2019 WL 168544, at *20 (S.D.N.Y. Jan. 11, 2019); Singleton v. Doe, No. 14-CV-0303-MKB, 2014 WL 3110033, at *3 (E.D.N.Y. July 7, 2014) (denying motion to dismiss due process claim where parolee-plaintiff alleged sex offender treatment program was imposed based on false allegation).

In short, on the record before the Court, Plaintiff has not established a clear or likely success on the merits of his due process claims challenging SARA and the resulting condition of post-release supervision, as applied to Plaintiff.[6]

Alleged Failure to Adhere to Regulations

Plaintiff makes repeated arguments that Defendants misinterpret SARA, as codified at New York Executive Law section 259-c(14), as a "blanket restriction on where all sex offenders may live," which is, according to Plaintiff, contrary to the provisions of Chapter 568 of the Laws of New York, 2008. (See Pl. Mem. at 27-29; docket entry no. 119 ("Reply Mem.") at 8.) Chapter 568, in relevant part, amended the New York Executive Law to require the promulgation of rules and regulations that include guidelines and procedures for the housing

---

[6]    To the extent Plaintiff seeks to challenge SARA on its face as violative of substantive due process—a position that is not entirely clear from Plaintiff's Fourth Amended Complaint or briefing on the instant Motion—Plaintiff also fails to demonstrate a clear of substantial likelihood of success on the merits. Plaintiff does not dispute that the appropriate standard of review for such a challenge would be rational basis review (Pl. Mem. at 31-32), and Plaintiff has made no attempt to show that there is no possible application of the statute that would be reasonably related to the State's interest in protecting the public, particularly children, and deterring recidivism of convicted sex offenders. See Cmty. Hous. Improvement Program v. City of New York, 59 F.4th 540, 548 (2d Cir. 2023) ("To prevail on a facial challenge, the plaintiff must establish that no set of circumstances exists under which the challenged Act would be valid." (citation and internal punctuation omitted)); see also Williams v. Dep't of Corr. and Cmty. Supervision, 24 N.Y.S.3d 18, 21 (N.Y. App. Div., 1st Dep't 2016) (reviewing SARA's history and purpose).

placement of individuals designated as level two and level three offenders under the Sex

Offender Registration Act ("SORA"), and further required that such regulations include certain

delineated factors for investigating and approving the residence of such offenders released on

presumptive release, parole, conditional release, or post-release supervision, specifically:

> (a) the location of other sex offenders required to register under the sex
> offender registration act, specifically whether there is a concentration of
> registered sex offenders in a certain residential area or municipality;
> (b) the number of registered sex offenders residing at a particular property;
> (c) the proximity of entities with vulnerable populations;
> (d) accessibility to family members, friends or other supportive services,
> including, but not limited to, locally available sex offender treatment
> programs with preference for placement of such individuals into programs
> that have demonstrated effectiveness in reducing sex offender recidivism
> and increasing public safety; and
> (e) the availability of permanent, stable housing in order to reduce the
> likelihood that such offenders will be transient.

Chapter 568 of the Laws of New York, 2008, § 2.  The resulting regulation, promulgated by the

Division of Parole, was codified at 9 N.Y.C.R.R. § 8002.7.[7]  See People v. Diack, 24 N.Y.3d

674, 682-84 (N.Y. 2015).

Chapter 568 "was intended, in part, to specifically address the warehousing of

level two and three sex offenders residing in SARA-compliant housing in concentrated locations

---

[7]     In 2011, when the Division of Parole and New York State Department of Correctional
Services were merged into a new entity, DOCCS, the New York State Legislature
repealed the prior section of the Executive Law containing Chapter 568's regulatory
mandate directed at the Division of Parole, and added a new section to the Correction
Law directing the Commissioner of DOCCS to promulgate rules and regulations for the
placement of level two and three sex offenders on, inter alia, post-release supervision,
with consideration of the same delineated factors as Chapter 568.  See Chapter 62 of the
Laws of New York, 2011, Part C, Subpart A §§ 1 (legislative purpose), 32 (adding a new
section 203 to the New York Correction Law), 37 (repealing former section 259 of the
New York Executive Law); see also Diack, 24 N.Y.3d at 683 n.5.

and the resulting risk to public safety in those neighborhoods[.]"[8]  Gonzalez v. Annucci, 32

N.Y.3d 461, 473 (N.Y. 2018); see also Diack, 24 N.Y.3d at 682-83.  The considerations

mandated by Chapter 568 therefore operate, as Defendants note, as "extra requirements for Level

II and III (i.e., worse) sex offenders," which do not negate the 1,000-foot requirement imposed

by SARA, as codified in Section 259-c(14).  (Defs. Mem. at 11.)  If there was any doubt, the

explicit language of Section 259-c(14), which provides that the 1,000-foot condition of parole or

release is mandatory "notwithstanding any other provision of law," is dispositive.  N.Y. EXEC.

Law § 259-c(14).  Plaintiff's apparent argument that Section 259-c(14)'s mandate can—and in

his case, should—be overridden based on consideration of the additional factors for housing of

level two and level three sex offenders therefore conflicts with the plain language of the statute.[9]

In any case, as Defendants note, (1) "state statutes do not create federally protected due process

entitlements to specific state-mandated procedures[,]" Holcomb v. Lykens, 337 F.3d 217, 224

(2d Cir. 2003), and (2) Plaintiff was reduced to a Level One Offender on February 1, 2024, and

thus the additional factors required for investigation and approval of level two and level three sex

---

[8]    The text Plaintiff cites as indicative of the legislative purpose of Chapter 568 comes not
       from the statute itself, but from the regulation.  (See Pl. Mem. at 29-30); 9 N.Y.C.R.R.
       § 8002.7(c)-(d).

[9]    The difficulty SARA's restriction could pose in implementing Chapter 568 was explicitly
       recognized in the memorandum filed with the New York State Assembly's bill approval.
       Mem. Filed with Assembly Bill Number 4988, Bill Jacket, Chapter 568, Laws of the
       State of New York, 2008 (noting that housing placement of sex offenders is "made more
       challenging by well-intentioned . . . State laws restricting sex offenders who are on
       probation or parole from entering within 1000 feet of school grounds[,]" but expressing
       belief "that the guidelines mandated by [Chapter 568] can balance" the competing factors
       and concerns laid out by the memorandum, including SARA).  Furthermore, there is no
       explicit language in the text of Chapter 568 or the legislative bill jacket that repeals
       SARA's mandate, and repeals by implication are not favored in New York state.  See
       Cimo v. State, 306 N.Y. 143, 149 (N.Y. 1953) ("'[R]epeal by implication is not favored
       and will be decreed only where a clear intent appears to effect that purpose[.]'" (citations
       omitted)); see also Diack, 24 N.Y.3d at 681-82 (discussing continued mandatory
       operation of SARA in 2015).

offender residence no longer apply to the investigation and approval of his residence.

To the extent Plaintiff asserts a due process claim on the basis that the grievance process related to his housing revocation was defective, a claim briefly articulated in his Fourth Amended Complaint (4AC ¶¶ 265-66), Plaintiff makes no argument as to this claim in his briefing on the instant Motion and has therefore failed to demonstrate a clear or substantial likelihood of success on the merits with respect to it.[10]  Moreover, process is not an end in itself, but rather serves "to protect a substantive interest to which the individual has a legitimate claim of entitlement."  Lykens, 337 F.3d at 224 (quoting Olim v. Wakinekona, 461 U.S. 238, 250 (1983)).  Plaintiff does not articulate how Defendants' alleged failure to provide information supporting the basis for Plaintiff's initial housing revocation is a violation of due process in and of itself, particularly where, as stated above, Plaintiff has not demonstrated that Defendants' imposition of the SARA-compliant housing condition was violative of due process.

Unconstitutional Vagueness

The "void-for-vagueness" doctrine is a component of the Due Process Clause, which "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  Kolender v. Lawson, 461 U.S. 352, 357 (1983) (citations omitted).  A party challenging a statute as void for vagueness may therefore prevail by establishing that the statute either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even

---

[10]    While the Fourth Amended Complaint details at length grievances submitted in connection with Plaintiff's claims concerning other conditions of post-release supervision (see, e.g., 4AC ¶¶ 109-16; docket entry no. 105-3 ("Exhibit C") at 13), the Court is unable to discern any details regarding Plaintiff's alleged housing-related grievance in either the Fourth Amendment Complaint or Plaintiff's briefing on the instant Motion.

encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000).

Plaintiff argues that "the interpretive application of SARA" is unconstitutionally vague, because it is "not enforced as written . . . but as a residency requirement," and that "the criteria for discerning where one may live is impenetrable without the approval of parole officers whose determinations include their individual opinion/sight evaluation and a computer program that does not provide the parolee with definition as to measurement."[11] (Pl. Mem. at 18.) Defendants argue that Plaintiff's contention concerning vagueness should be deemed waived "in light of Plaintiff's perfunctory briefing[,]" and that, to the extent the Court considers the merits of this argument, "multiple courts have rejected similar contentions, including the Supreme Court" in the single case cited by Plaintiff in support of his vagueness argument, Grayned v. City of Rockford, 408 U.S. 104 (1972). (Defs. Mem. at 9 n.6.)

Indeed, at least one court in this Circuit faced with the same challenge to SARA's geographical restriction found the plaintiff's void-for-vagueness argument to be unavailing. In that case, Yunus v. Robinson, Magistrate Judge Barbara C. Moses reasoned that the restriction imposed by SARA "is not unconstitutionally vague as applied to where [a covered individual] may reside, since preclearance of residences by a parole office means there is no risk of an inadvertent violation[.]" No. 17-CV-5839-AJN-BCM, 2019 WL 168544, at *12 (S.D.N.Y. Jan. 11, 2019). Specifically, Judge Moses found that the measurement for "school grounds" pursuant to section 220(14) of the New York Penal Law was sufficiently definite, measured precisely by a software program, CIRIS, and that the plaintiff was in "no danger of inadvertently moving into a

---

[11]    This challenge is, in essence, an as-applied challenge, as Plaintiff is not arguing that the law is vague as written. (See Pl. Mem. at 18 ("The law is thus vague as it is interpreted not as written[.]").)

non-compliant residence," as the plaintiff, like Plaintiff here, was required to have his residence approved before moving. No. 17-CV-5839-AJN-BCM, 2018 WL 3455408 at *26 (S.D.N.Y. June 29, 2018), adopted by, 2019 WL 168544 (S.D.N.Y. Jan. 11, 2019). In reaching this conclusion, Judge Moses explicitly acknowledged that "[i]t is no doubt inconvenient for plaintiff—and for other parolees seeking SARA-compliant housing—that Google Maps and other publicly-available programs do not provide the same level of precision as CIRIS[,]" but found such difficulty did not render the condition unconstitutionally vague, "at least not if it merely constitutes a 'residency restriction,' which is how [the New York State] defendants describe[d] it." Id. Judge Alison J. Nathan adopted this portion of Judge Moses' report and recommendation in full. 2019 WL 168544, at *12-14.

The Court finds this reasoning persuasive, and sees no reason to deviate from it in the instant case, particularly where Defendants have proffered declarations confirming that their methodology for calculating the distances specified by New York Penal Law section 220.00(14) is the same as that understood by the Yunus Court.[12] Compare (Tucker Decl. ¶ 8 (explaining that DOCCS utilizes CIRIS to calculate whether there are any school grounds within 1,000 feet of a proposed parolee address, which is measured from "the front door of the proposed residence to 1,000 feet of the school property as defined in the school's tax records"); Supp. Tucker Decl.

---

[12]    Plaintiff's challenge concerns SARA's de facto residency restriction; he notably does not seek relief upon the other grounds considered under the void-for-vagueness doctrine in Yunus. (See Pl. Mem. at 18 ("The inability of Plaintiff to discern where he may live without a detail of criteria renders the application of SARA by Defendants unconstitutionally vague.")); 2019 WL 168544, at *12-14 (examining argument that SARA is unconstitutionally vague "as to where Plaintiff is allowed to travel"). Moreover, Judge Nathan evaluated the void-for-vagueness claim under a motion to dismiss standard, rather than the standard for preliminary injunction, instead granting plaintiff a preliminary injunction on his substantive due process claim that had posed a threshold issue. Id. at *25.

(demonstrating 1,000-foot radius calculation from Plaintiff's home address utilizing CIRIS)),

with Yunus, 2018 WL 3455408 at *26 ("[Section] 220.00(14) . . . specifies that 'school grounds'

include a 1,000-foot buffer zone measured from 'the real property boundary line comprising any

such school.' Just as clearly, the New York courts have held that the 1,000-foot distance is to be

measured 'by a straight-line or 'as the crow flies' method[.]'" (citations omitted)).

In sum, Plaintiff has not demonstrated a "clear" or "substantial" likelihood of

success on the merits of any of the many asserted grounds for a due process violation, and the

Motion must be denied on this basis as to his due process claims. Otoe-Missouria Tribe of

Indians, 769 F.3d at 110.

Takings Claim

Plaintiff asserts that SARA's geographic restriction amounts to an

unconstitutional taking because (1) Defendants refused to "abide by the evaluative mandate of

New York State law," and (2) "[Plaintiff] owned his property prior to the enactment of SARA."

(Pl. Mem. at 27.) The Supreme Court has identified two "guidelines" relevant for determining

when a government regulation constitutes an unconstitutional taking: (1) "with certain

qualifications . . . a regulation which 'denies all economically beneficial or productive use of

land' will require compensation under the Takings Clause," as enunciated by the Supreme Court

in Lucas v. S.C. Coastal Council, 505 U.S. 1003 (1992); and (2) a regulation that does not deny

all economically beneficial or productive use property may nevertheless constitute a taking

"based on 'a complex of factors,' including (1) the economic impact of the regulation on the

claimant; (2) the extent to which the regulation has interfered with distinct investment-backed

expectations; and (3) the character of the governmental action[,]" often referred to as the Penn

Central balancing test, after the case that established this line of takings analysis, Penn

Central Transp. Co. v. City of New York, 438 U.S. 104 (1978). Murr v. Wisconsin, 582 U.S. 383, 393 (2017) (citations omitted).

Plaintiff's first argument, concerning the interpretation of Chapter 568, is unavailing for the reasons discussed above. See discussion supra pp. 13-16. As to the argument that SARA and the resulting restriction on Plaintiff as a covered post-release supervisee amount to an unconstitutional taking, Penn Central provides the proper framework to evaluate Plaintiff's claim, as neither party contends that Plaintiff has been denied all economically beneficial or productive use of his home. (Pl. Mem. at 19-23; Defs. Mems. at 13-14.) Plaintiff appears to argue that he succeeds under the Penn Central framework, because his case is distinguishable from the case of Vasquez v. Foxx—a case in which the Court of Appeals for the Seventh Circuit considered a similar takings claims.[13]—in that Plaintiff "owned his property prior to the enactment of SARA." (Pl. Mem. at 27.) See 895 F.3d 515 (7th Cir. 2018), rev'd on other grounds, Koch v. Vill. of Hartland, 43 F.4th 747 (7th Cir. 2022).

In Vasquez, the plaintiffs—two registered child sex offenders who lived in Chicago—challenged the 2008 amendment to Illinois' residency restriction for child sex offenders, which precluded the plaintiffs from residing in their leased apartment and purchased home, respectively. 895 F.3d at 518-19. As originally enacted, the law "prohibited child sex offenders from knowingly residing within 500 feet of a 'playground or a facility providing programs or services exclusively directed toward persons under 18 years of age.'" Id. at 518 (citation omitted). The 2008 amendment broadened the restriction to also prohibit child sex offenders from "knowingly residing within 500 feet of a 'day care home' or 'group day care

---

[13]    The Seventh Circuit appears to be the only Court of Appeals to have addressed a takings claim in a factual context analogous to Plaintiff's.

home.'" Id. (citation omitted).  Notably, both the Illinois law and its 2008 amendment involved

a more onerous residency restriction than the SARA restriction at issue in the instant case, as the

Illinois law and amendment applied to all individuals convicted of sex offense against a minor

victim in apparent perpetuity, rather than as a temporary condition of supervision incident to

release from incarceration.  See id. at 517-18; 720 ILL. COMP. STAT. 5/11-9.3(d)(1) (defining

"child sex offender").

   Although the Seventh Circuit found that the plaintiffs' takings claim premised on

the 2008 amendment was procedurally barred,[14] the Court noted that the claim would

nevertheless fail on the merits.  Id. at 522-23.  Specifically, the Court examined the three Penn

Central factors cited above, finding that (1) looking to the "nature of the government action,"

"[a]lthough the Illinois law restricts a child sex offender's use of his property, it cannot be

characterized as a physical invasion[,]" instead "merely adjust[ing] the benefits and burdens of

economic life[,]" id. at 523; (2) as to the economic impact of the 2008 amendment, although the

plaintiffs could not reside within the 500-foot buffer zone, "there is no question that many others

can, leaving open a broad market [for plaintiffs] to sell or sublease their residences at full market

value[,]" id at 523-24 (analogizing to the case of Andrus v. Allard, 444 U.S. 51 (1979)); and (3)

because the Illinois law was in effect at the time the plaintiffs purchased or leased their property,

"its terms were necessarily part of any property-rights expectations they could have held[,]" and

---

[14] Specifically, the Seventh Circuit found that "[then-]current law require[d] exhaustion of
state mechanisms for obtaining compensation before a takings claim can be brought in
federal court[,]" and that the plaintiffs had not exhausted their takings claim prior to
initiating the action.  Vasquez, 895 F.3d at 522-23 (citing Williamson Cnty. Reg'l
Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 194 (1985)).  As a result of the
Supreme Court's holding in Knick v. Twp. of Scott, 588 U.S. 180 (2019), which
overruled Williamson Cnty., exhaustion of state law remedies is no longer a prerequisite
to mounting a Fifth Amendment takings claim in federal court under Section 1983, and
so this portion of the Vasquez decision has no bearing on Plaintiff's takings claim.

thus the law could not be argued to "interfere with distinct investment-backed expectations" held by the plaintiffs.  Vasquez, 895 F.3d at 524.

While Plaintiff is correct that his case is factually distinct in the sense that, unlike the Vasquez plaintiffs, he owned his home prior to the passage of the law on which he premises his taking claim, SARA, the geographic restriction imposed by SARA was the "entirely foreseeable" result of his "voluntary conduct" following the law's enactment, i.e., his criminal offense involving child pornography for which he was convicted.  See, e.g., Paradissiotis v. United States, 304 F.3d 1271, 1276 (Fed. Cir. 2002) (finding no taking where plaintiff's stock options were frozen because plaintiff voluntarily "took the step that subjected him to regulations that otherwise would have had no effect on him" and "had clear notice of what the consequences of his actions would be[,]" i.e., "loss of access to his United States assets" (citation omitted)); see also Vasquez, 895 F.3d at 524 (rejecting "expansive understanding of a property owner's investment-backed expectations" enunciated by Georgia Supreme Court in Mann v. Ga. Dep't of Corrs., 282 Ga. 754 (Ga. 2007) as to similar residency restriction).  The interference with his "distinct investment-backed expectations," i.e., his access to his home, was therefore the result of his own voluntary conduct that brought him within the ambit of SARA's existing statutory and regulatory framework.

Moreover, the other Penn Central factors that weighed against the Vasquez plaintiffs appear equally fatal to Plaintiff's case.  As in Vasquez, SARA does not operate as a physical invasion of Plaintiff's property, Vasquez, 895 F.3d at 523, and Plaintiff is able to make other productive use of his home, id. at 523-24, lessening the economic impact of SARA as applied to Plaintiff.  The latter factor is even more compelling in the instant case because, unlike in Vasquez, the restriction on Plaintiff's residency is temporary, meaning any economic impact

of the restriction is lesser than that in <u>Vasquez</u>.  (Jt. Mem. at 1 (concurring that "SARA's geographical restriction . . . will expire with Plaintiff's term of post release supervision").) Plaintiff does not persuasively demonstrate why a finding contrary to the decision in <u>Vasquez</u> is warranted in this case.

In sum, in view of the foregoing deficiencies, Plaintiff has not established a clear or substantial likelihood of success on the merits as to his takings claim.

<u>First Amendment Claims</u>

Plaintiff has also not established a clear or substantial likelihood of success on the merits as to his First Amendment claims concerning SARA and his resulting condition of supervised release.  Plaintiff devotes a single paragraph in his opening brief and scant text on reply as to his argument that SARA's 1,000-foot restriction operates as a restriction on Plaintiff's protected rights of speech and association.  (Pl. Mem. at 17-18 (arguing that SARA violates Plaintiff's protected speech); Reply Mem. at 1 (arguing that SARA violates Plaintiff's right to freedom of association).)

Plaintiff appears to point to the case of <u>United States v. Eaglin</u>, 913 F.3d 88 (2d Cir. 2019), as analogous and controlling.  (Pl. Mem. at 17.)  <u>Eaglin</u> involved a condition of supervised release that completely prohibited the defendant-appellant from accessing the Internet, and the condition was evaluated in light of (1) the standard for federal supervised release, 18 U.S.C. section 3583(d) ("Section 3583(d)"), which provides that an imposed special condition of federal supervised release must not amount to a "greater deprivation of liberty than is reasonably necessary" for the relevant statutory sentencing purposes set forth in 18 U.S.C. section 3553(a), and (2) the Supreme Court's holding in <u>Packingham v. North Carolina</u>, 582 U.S. 98 (2017), which recognized a First Amendment right to access the internet.

In Packingham, the Court applied intermediate scrutiny and struck down a North Carolina state law that prohibited registered sex offenders from accessing commercial social networking sites where minors were permitted to create or maintain webpages.  582 U.S. at 102. Because the Court made no exception as to individuals "subject to the supervision of the criminal justice system," to whom the law also applied (id. at 107), courts in the Second Circuit have since applied intermediate scrutiny to blanket internet restrictions and "blanket limitations on an individual's ability to access social media" imposed pursuant to state law, even where an individual is on parole or post-release supervision.  See, e.g. Jones v. Stanford, 489 F. Supp. 3d 140, 145-46 (E.D.N.Y. 2020); Yunus v. Robinson, No. 17-CV-5839-AJN, 2019 WL 168544, at *15-17 (S.D.N.Y. Jan. 11, 2019) (adopting report and recommendation).

Ordinarily, however, "the First Amendment rights of parolees are circumscribed[,]" Farrell v. Burke, 449 F.3d 470, 497 (2d Cir. 2006), and restrictions on First Amendment rights in this context, including associational rights, have been found permissible "so long as the restrictions are reasonably and necessarily related to the [state] Government's legitimate interests in the parolee's activities."  Birzon v. King, 469 F.2d 1241, 1243 (2d Cir. 1972) (citation omitted); see also Farrell, 449 F.3d at 498 (applying Birzon standard to evaluate First Amendment vagueness and overbreadth challenges to plaintiff-appellant's special condition of New York state parole, reasoning that, "[b]ecause [plaintiff-appellant] was a convicted sex offender, most regulations of his possession of sexual material would be 'reasonably and necessarily related to the Government's legitimate interests in the parolee's activities' and thus would not violate the First Amendment").  As discussed above, the instant SARA restriction has been repeatedly upheld against a rational basis standard of review.  See discussion supra at 10-11; (see also Defs. Mem. at 9 (gathering case law).)

Plaintiff appears to argue in his supplemental briefing that heightened scrutiny should instead apply, at least to as to his First Amendment associational claim, citing the federal standard for supervised release, Section 3583(d), and case law interpreting it.  (See, e.g., Jt. Mem. at 11 (discussing requirements of Section 3583(d).)  Plaintiff's condition was, however, imposed pursuant to state law, meaning the federal standard is not here authoritative, and Plaintiff does not contend with Birzon and its progeny.

Even assuming that a heightened standard of scrutiny applies to Plaintiff's First Amendment challenges to SARA and his resulting condition of post-release supervision—to the extent he argues that the statute and condition impinge on expressive conduct, see United States v. Thompson, 896 F.3d 155, 164 (2d Cir. 2018) ("When . . . an individual engages in conduct that does not manifest an intent to convey a particularized message, the First Amendment does not come into play." (citation and internal quotation marks omitted))—Plaintiff has still not demonstrated a clear or substantial likelihood of success on the merits.  SARA and conditions imposed pursuant to SARA operate to prevent certain convicted sex offenders from knowingly entering into or upon school grounds, i.e., to minimize offender proximity to minors; whatever burden the statute imposes on protected speech or association is therefore incidental, and in no way depends on the content or nature of such speech or association.  A content-neutral regulation that imposes incidental burdens on protected First Amendment conduct satisfies intermediate scrutiny "if it (1) 'advances important governmental interests unrelated to the suppression of free speech' and (2) 'does not burden substantially more speech than necessary to further those interests.'"  Time Warner Cable Inc. v. FCC, 729 F.3d 137, 160 (2d Cir. 2013) (citations omitted).  A regulation's burden is not greater than necessary "so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the

regulation." Rumsfeld v. Forum for Acad. & Inst. Rts., Inc. ("FAIR"), 547 U.S. 47, 67 (2006)

(citation omitted). Thus, "when a content-neutral regulation does not entirely foreclose any

means of communication, it may satisfy the tailoring requirement even though it is not the least

restrictive or least intrusive means of serving the statutory goal." Hill v. Colorado, 530 U.S. 703,

726 (2000).

   In the instant case, as Defendants argue, SARA "obviously promotes a substantial

government interest" unrelated to speech, namely, "protecting children from sex offenders,"

which would be achieved less effectively absent the restriction. (Jt. Mem. at 10); see also FAIR,

547 U.S. at 67-68 (explaining that it is not the role of the court to determine whether alternatives

to a challenged regulation are preferable or adequate when examining whether an otherwise

neutral regulation promotes a substantial government interest). The law also imposes minimal

limitation on Plaintiff's expressive conduct, instead merely prohibiting Plaintiff from physically

entering statutorily-defined school grounds; he is free to engage in any First Amendment

activities outside those delineated areas.

   Finally, to the extent Plaintiff seeks to assert a facial overbreadth challenge to

SARA (see 4AC ¶ 217 (noting that "the First Amendment's overbreadth doctrine provides that a

statute is facially invalid if it prohibits a substantial amount of protected speech")), Plaintiff has

also failed to demonstrate any likelihood of success on the merits, having failed to brief the issue

at all. (See Pl. Mem. at 17 (arguing that, "[a]s applied to Plaintiff, SARA" interferes with his

ability to "enter the village square and stand physically upon a soap box[,]" attend certain public

rallies, vote at certain polling locations, and attend his parole check-ins (emphasis added)); Jt.

Mem. at 11 (discussing SARA's alleged effect on Plaintiff's associational rights)); cf. Farrell,

449 F.3d at 498 ("A party alleging overbreadth claims that although a statute did not violate his

or her First Amendment rights, it would violate the First Amendment rights of hypothetical third parties if applied to them." (citation omitted)).

In sum, Plaintiff has failed to show a clear or substantial likelihood of success on the merits as to his First Amendment claims concerning SARA and his resulting condition of post-release supervision.

<u>Demonstration of Harm, Balance of Equities, and Public Interest</u>

While Plaintiff's failure to establish a clear or substantial likelihood of success on the merits of his claims is alone fatal to the instant Motion, the Court briefly considers the remaining preliminary injunction factors, which further weigh against Plaintiff's requested relief.

<u>Demonstration of Irreparable Harm</u>

Plaintiff argues that he has made a showing of irreparable harm because "an alleged constitutional violation constitutes irreparable harm," and he is thus entitled to a presumption of irreparable harm stemming from his claims for "procedural and substantive due process rights under the Fifth and Fourteenth Amendments[.]" (Pl. Mem. at 33-34 (citations omitted).) As detailed at length above, however, Plaintiff has not established a likelihood of success on the merits as to any of his constitutional claims, and thus he is not entitled to such a presumption of harm.

Plaintiff's arguments concerning irreparable harm are also severely undermined by the fact that Plaintiff (1) waited more than three years to file the instant Motion after he was first informed by Defendants that his home was not SARA-compliant, and nearly two years after he commenced the instant action; and (2) Plaintiff previously filed a preliminary injunction in this case, in March of 2024, but chose not to include his SARA-related claims at that time. <u>See, e.g.</u>, <u>KF ex rel. CF v. Monroe Woodbury Cent. Sch. Dist.</u>, No. 12-CV-2200-ER, 2012 WL

1521060, at *5 (S.D.N.Y. Apr. 30, 2012) (gathering cases for proposition that "[d]elay in seeking a preliminary injunction may also negate a showing of irreparable harm because 'the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief.'"); Council for Responsible Nutrition v. James, No. 24-CV-1881-ALC, 2024 WL 1700036, at *9 (S.D.N.Y. Apr. 19, 2024) (finding that plaintiff's five-month delay in moving for preliminary injunction on First Amendment claim "erode[d] [plaintiff's] claims of immediate, irreparable, and impending injury"); Broecker v. N.Y.C. Dep't of Educ., 573 F. Supp. 3d 878, 890 (E.D.N.Y. 2021) (finding that plaintiffs' "lengthy delay"—44 days—in seeking to enjoin separation of certain public employees on due process grounds "greatly undermine[d] the strength of [p]laintiffs' 'emergency' motion for preliminary injunction").  With less than five months remaining of his period of supervision, Plaintiff filed the instant Motion, apparently because Defendants would not—and they maintain, per governing law, cannot—resolve the housing restriction informally.  (See docket entry no. 106 (explaining, in request for leave to file excess pages in opening brief for instant Motion, that "[i]t is hoped that the detail will result again in the acquiescence of Defendants as was the result of the first preliminary injunction practice regarding the internet and First Amendment").)

Moreover, the fact that Plaintiff is in a shelter setting is not wholly the result of the SARA restriction; Defendants approved housing options submitted by Plaintiff as SARA-compliant in December 2021, December 2024, and January 2025, but his leasing applications were either denied by private landlords because of his conviction, or Plaintiff did not apply in the first instance, largely because of the financial burden the leasing arrangements would impose.  (Pl. 2nd Decl. ¶¶ 9, 12-15.)  Accordingly, the harm alleged is not necessarily "one that cannot be remedied if a court waits until the end of trial[,]" see Faiveley Transp. Malmo AB v.

Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted), as there remains the

possibility that Plaintiff can find SARA-compliant housing on the private market.  The fact that

private housing arrangements are financially burdensome, while sympathetic, does not constitute

irreparable harm for purposes of a preliminary injunction.  (See Pl. Mem. at 20 (discussing the

financial burden of residing in another location that is not Plaintiff's home residence); Pl. 2nd

Decl. ¶¶ 14-15 (same)); see also Moore v. Consol. Edison Co. of N.Y., Inc., 409 F.3d 506, 510

(2d Cir. 2005) ("Where there is an adequate remedy at law, such as an award of money damages,

injunctions are unavailable except in extraordinary circumstances." (citations omitted));

Broecker, 573 F. Supp. 3d at 889-90.

        In sum, Plaintiff has failed to make a "strong showing" of irreparable harm.

        Balance of Equities and Public Interest

        Plaintiff also argues that the balance of equities and public interest favor granting

the requested injunction, because Defendants have misapplied the law—specifically, Chapter

568—and because he has alleged constitutional violations.  (See Pl. Mem. at 34-36.)  As

explained above, however, Plaintiff's interpretation of Chapter 568 is contrary to the legislative

history of that law and the plain text of SARA, and he has not demonstrated a clear or substantial

likelihood of success as to any of his constitutional claims asserted.

        Moreover, the State has a well-recognized and compelling interest in "protecting

the physical and psychological well-being of minors[,]" Sable Communs. of Cal. v. FCC, 492

U.S. 115, 126 (1989), and an "overwhelming interest" in supervising individuals on parole in

order to prevent recidivism, United States v. Quinones, 457 F. App'x 68, 70 (2d Cir. 2012)

(quoting Penn. Bd. of Probation and Parole v. Scott, 524 U.S. 357, 365 (1998)).  While, as

Defendants note, Plaintiff has asserted that he is caused great hardship by his shelter housing,

and that he has been rehabilitated and presents no danger to children as a non-contact offender, these considerations are outweighed by the foregoing State interests and the fact that Plaintiff has never been required to reside in a shelter.  (<u>See</u> Defs. Mem. at 18-19 ("... Plaintiff has proposed a number of alternative residences, at least twelve of which Defendants have <u>approved</u>." (emphasis in original))); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Doe v. Miller</u>, 418 F.3d 950, 953 (8th Cir. 2005) (reasoning that any cost and hardship resulting from sex offender residency restriction "is balanced by the public interest in enforcement of the statute").

In short, Plaintiff has not shown that the balance of equities and public interest weigh in favor of the requested injunctive relief.

<u>C</u>ONCLUSION

For the foregoing reasons, Plaintiff's Motion is denied.  This Memorandum Opinion and Order resolves docket entry nos. 110-114.

This case remains referred to Magistrate Judge Stewart D. Aaron for general pretrial management.

SO ORDERED.

Dated: New York, New York
       May 13, 2025

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge